UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NANCY MALEK,

        Plaintiff,

    v.

MARC MALEK,

        Defendant.

No. 19 CV 8076

Judge Manish S. Shah

MEMORANDUM OPINION AND ORDER

Plaintiff Nancy Malek was married to defendant Marc Malek's brother, Michel Malek. Plaintiff alleges that her ex-husband—a successful neurosurgeon—moved millions of dollars in assets around to place them beyond plaintiff's reach in their divorce. She alleges that defendant helped his brother conceal those transfers by creating a series of sham financial documents. The couple began divorce proceedings a few years later, and Michel Malek moved to Lebanon. A state court entered a $28 million judgment against him, which plaintiff has been unable to collect. She alleges that her former brother-in-law violated the Illinois Uniform Fraudulent Transfer Act, and she brings claims of tortious interference with economic expectancy and civil conspiracy. Defendant moves to dismiss. For the reasons discussed below, his motion is granted.

## I.  Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). The complaint must

contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In reviewing a motion to dismiss, I construe all factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Sloan v. Am. Brain Tumor Ass'n*, 901 F.3d 891, 893 (7th Cir. 2018).

## II.    Facts

Until 2014, plaintiff was married to Michel Malek,[1] a practicing neurosurgeon. [1] ¶¶ 9–10.[2] In May 2008, plaintiff's ex-husband formed MMSN, a limited partnership, and transferred the assets of his neurosurgery practice into the limited partnership. [1] ¶ 11. A year later, he settled the Michel Malek Grantor Trust. [1] ¶ 13. Defendant and his sister, who lived in Beirut, Lebanon, were named as co-trustees. [1] ¶¶ 13, 27. The only asset in the grantor trust was a promissory note from the ex-husband of $908,000. [1] ¶ 13. The Maleks' children were named as beneficiaries of the grantor trust. [1] ¶ 13.

In 2010, plaintiff's ex-husband funded the Michel Hanna Malek Revocable Trust. [1] ¶ 14. He was the trustee, and plaintiff was a beneficiary. [1] ¶ 14. The ex-husband deeded a condominium to the revocable trust; in 2011, the trust transferred the condo to MMSN. [1] ¶ 12, 15–16. The same day, the ex-husband, as president of MMSN, acknowledged receipt of $9,151,918 from the revocable trust as a cash

---

[1] Because the parties share a last name, for ease of reading I refer to Nancy Malek as plaintiff, Marc Malek as defendant, and Michel Malek as the ex-husband.

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. Facts are taken from the complaint.

contribution to capital. [1] ¶ 17. The revocable trust's ownership of MMSN at that point was 83.8%. [1] ¶ 17. A few months later, MMSN bought a $1.021 million Bugatti car for the ex-husband. [1] ¶ 18. By February 2012, MMSN was worth $33 million, including $13.6 million in cash. [1] ¶ 19.

On February 12, 2012, the ex-husband assaulted the Maleks' 17-year-old daughter. [1] ¶ 20. He moved out of their home and was arrested and criminally charged. [1] ¶ 20. On February 27, 2012, in anticipation of a divorce from plaintiff, the ex-husband transferred $13.6 million from MMSN's account at PNC Bank to the account of his mother at Bank Audi in Beirut, Lebanon. [1] ¶ 21.

A few days later, the ex-husband amended the revocable trust agreement, stating that he was presently married to plaintiff, but was in the process of dissolving their marriage. [1] ¶ 23. He acknowledged that the amendment was intended to exclude plaintiff from any interest or benefit under the trust agreement. [1] ¶ 23.

Within a few days of the $13.6 million transfer, the ex-husband created several documents to make the $13.6 million transfer appear justified in order to avoid a fraudulent-transfer lawsuit. [1] ¶¶ 22, 24. His attorneys and defendant helped him. [1] ¶ 22. The ex-husband and his attorneys created the documents on March 7, 2012, but backdated them to February 27, 2012, or other dates. [1] ¶ 24.

One such document appeared to sell the revocable trust's ownership interest in MMSN to the grantor trust in exchange for a promissory note of $12.2 million. [1] ¶ 26. After that transfer, the grantor trust held 95.9% of the limited partnership interest in MMSN. [1] ¶ 26. The document selling MMSN's ownership interest was

3

dated February 16, but plaintiff's ex-husband actually created it on March 7. [1] ¶ 26. Defendant and his sister, the co-trustees of the grantor trust, executed the $12.2 million promissory note. [1] ¶ 27. The ex-husband documented a $12.2 million distribution from MMSN to the grantor trust, but that distribution was fake, because the ex-husband had already transferred that money to his mother in Beirut. [1] ¶ 28.

The ex-husband also executed an "Acknowledgement of Payment in Full" recognizing receipt of $12.2 million from the grantor trust to the revocable trust. [1] ¶ 29. Plaintiff alleges this repayment was fake, and that, although it was dated February 27, her ex-husband created it on March 7. [1] ¶ 29. With the help of defendant, the ex-husband transferred his business and all of its assets to the grantor trust and received nothing in exchange. [1] ¶ 29.

The ex-husband created a second acknowledgement of payment in which his mother acknowledged receiving $12.2 million in return for a $4 million loan she had given him in 2001; that loan never happened. [1] ¶ 30. He also created a document appearing to transfer $1.4 million from MMSN to his mother, to make up the difference between $13.6 and $12.2 million. [1] ¶ 31. The series of documents allowed plaintiff's ex-husband, with defendant's help, to transfer $13.6 million in cash to their mother, and to transfer MMSN to the grantor trust, to prevent plaintiff from recovering her share of the marital estate and to hinder her rights as a beneficiary of the revocable trust. [1] ¶ 32.

In May 2014, plaintiff filed a petition to dissolve the marriage, and a few months later, her ex-husband fled to Lebanon. [1] ¶¶ 33–34. In December 2015, her

ex-husband's attorneys produced for the first time the backdated documents, as well as the documents revealing that they had been backdated. [1] ¶ 35. In May 2016, the Circuit Court of Cook County entered a default judgment against the ex-husband for $27,438,721. [1] ¶ 36.

## III.  Analysis

Plaintiff brings three claims against her former brother-in-law. She alleges that he violated the Illinois Uniform Fraudulent Transfer Act (Count I) and brings claims of tortious interference with economic expectancy (Count II) and civil conspiracy (Count III).[3]

### A.  Illinois Uniform Fraudulent Transfer Act

The Illinois Uniform Fraudulent Transfer Act was created to "prevent fraudulent transfers of property by a debtor who intends to defraud creditors by placing assets beyond their reach." *Zurich Am. Ins. Co. v. Personnel Staffing Group, LLC*, 2018 IL App (1st) 172281, ¶ 18 (citation omitted); *see also Northwestern Mem'l Hosp. v. Sharif*, 2014 IL App (1st) 133008, ¶ 16. Since the statute is a uniform act, courts may look to other states' interpretations of the statute. *See In re Image Worldwide, Ltd.*, 139 F.3d 574, 577 (7th Cir. 1998); *see also* 740 ILCS § 160/12 ("This Act shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this Act among states enacting it."). Likewise, the Uniform Fraudulent Transfer Act was intended to harmonize state law with the

---

[3] The court has subject-matter jurisdiction over these state-law claims. Plaintiff is a citizen of Illinois, and defendant is a citizen of New York. [1] ¶¶ 5–6. The amount in controversy exceeds $75,000. [1] ¶ 7. 28 U.S.C. § 1332.

Bankruptcy Code. *Image Worldwide*, 139 F.3d at 577. So the Act parallels 11 U.S.C. § 548, and courts may also look to bankruptcy cases for assistance in interpreting the statute. *Creditor's Comm. of Jumer's Castle Lodge, Inc. v. Jumer*, 472 F.3d 943, 947 (7th Cir. 2007); *Image Worldwide*, 139 F.3d at 577.

There are two types of fraudulent transfer in Illinois: fraud in fact (or actual fraud) and fraud in law (or constructive fraud). 740 ILCS §§ 160/5(a)(1), (2), 160/6(a); *see Centerpoint Energy Servs., Inc. v. Halim*, 743 F.3d 503, 506 (7th Cir. 2014); *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1078 (7th Cir. 1997). To prove fraud in fact, a plaintiff must show an "actual intent to hinder, delay, or defraud any creditor of the debtor." 740 ILCS § 160/5(a)(1). Fraud in law, the type at issue here, occurs when the debtor makes a transfer without receiving a reasonably equivalent value in exchange; there is an existing or contemplated debt against him; and he does not retain sufficient property to pay that debt. *Gen. Elec.*, 128 F.3d at 1078–79. A creditor need not show fraudulent intent to establish constructive fraud; fraud is presumed if a debtor transfers property for less than the adequate value and is therefore unable to meet his obligations. *Id.* at 1079.

The Fraudulent Transfer Act prohibits two types of constructive fraud, under §§ 160/5(a)(2) and 6(a). Plaintiff cites § 6(a) in her complaint, but relies in her response brief on § 160/5(a)(2). To state a claim under § 160/5(a)(2), she must show a transfer occurred, the debtor did not receive a "reasonably equivalent value in exchange," and the debtor either "was engaged or was about to engage in" a "business or transaction" for which his remaining assets were unreasonably small in relation

to the business or transaction, *id.* § 160/5(a)(2)(A), or the debtor "intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." *Id.* § 160/5(a)(2)(B). Constructive fraud under § 5(a)(2) occurs whether the creditor's claim arose before or after the transfer. *Apollo Real Estate Investment Fund, IV, L.P. v. Gelber*, 403 Ill.App.3d 179, 192 (1st Dist. 2010). Under § 6(a), a creditor must show that the debtor did not receive reasonably equivalent value for the transfer, and the debtor was insolvent at the time of the transfer or became insolvent as a result of it. A claim under this subsection must have arisen before the transfer. *Apollo*, 403 Ill.App.3d at 192.

Under either subsection, the plaintiff must establish a creditor-debtor relationship. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec,* 529 F.3d 371, 383 (7th Cir. 2008); *A.P. Properties, Inc. v. Goshinsky*, 186 Ill.2d 524, 528 (1999). A creditor under the Act is a "person who has a claim," 740 ILCS § 160/2(d), and a "debtor" is a person "who is liable on a claim." *Id.* § 160/2(f). A "claim" is defined as a "right to payment," even if that right hasn't matured or been reduced to judgment yet. *Id.* § 160/2(c); *Zurich*, 2018 IL App (1st) 172281, ¶ 18.

If the creditor establishes that a fraudulent transfer occurred, 740 ILCS § 160/8 provides equitable remedies, and § 160/9 allows for money judgments. A money judgment may be entered against "the first transferee of the asset." *Id.* 160/9(b)(1).

### 1. Timeliness

A complaint need not anticipate affirmative defenses, such as untimeliness. *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019). Because affirmative defenses often turn on facts not before the court at the pleading stage, dismissal is appropriate only when the complaint "unambiguously establish[es] all the elements of the defense." *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016). To warrant dismissal, the affirmative defense must be "ironclad." *Foss v. Bear, Stearns & Co.*, 394 F.3d 540, 542 (7th Cir. 2005).

When a plaintiff alleges actual fraud under § 160/5(a)(1) of the Fraudulent Transfer Act, she must bring an action within four years after the transfer was made, or, if later, within one year after the transfer was or reasonably could have been discovered. 740 ILCS § 160/10(a). If her claim is under §§ 160/5(a)(2) or 160/6(a), she must bring the claim "within 4 years after the transfer was made." *Id.* § 160/10(b).

Plaintiff alleges that her ex-husband fraudulently transferred MMSN's ownership interest from the revocable trust to the grantor trust in February 2012. So she had until February 2016 to bring her suit. She discovered the transfer in December 2015. She filed this lawsuit in December 2019, almost eight years after the transfer. [1]. Plaintiff relies on two exceptions to the four-year time bar to argue that her claim is timely: the discovery rule and fraudulent concealment.

As an initial matter, the time bar in § 160/10(b) is a statute of repose, not a statute of limitations. A statute of limitations creates a time limit for bringing a case based on the date the claim accrued. *CTS Corp. v. Waldburger*, 573 U.S. 1, 7 (2014).

A claim accrues when the plaintiff can file suit and obtain relief—typically when the injury occurred or was discovered. *Id.* at 7–8. A statute of repose sets an outer limit on the right to sue based on the date of the defendant's last culpable act or omission, even if that period ends before the plaintiff suffers an injury. *Id.* at 8. Each is "targeted at a different actor": statutes of limitation require plaintiffs to pursue their claims, while statutes of repose reflect a legislative judgment that defendants should be free from liability after a certain amount of time. *Id.* at 8–9. The Fraudulent Transfer Act directs that a plaintiff's claim under §§ 5(a)(2) and 6(a) is extinguished if she doesn't bring it within four years after the transfer was made. The time bar dates back to the last culpable act—when the transfer was made—not when the plaintiff discovered it or was injured. It is a statute of repose.[4]

Since the time bar is a statute of repose, the discovery rule does not apply. *Doyle v. Hood*, 2018 IL App (2d) 171041, ¶ 21 ("A statute of repose is not tolled by the discovery rule." (citation omitted)). Even if considered a statute of limitations, the discovery rule would not render plaintiff's claim timely. The statute explicitly provides a discovery rule to toll the statute of limitations when a claim alleges fraud in fact, and it omits the option for fraud in law in the same section of the statute. When a legislature includes particular language in one section of a statute, but omits

---

[4] In passing, the court of appeals referred to the Act having a statute of limitations. *GEA Grp. AG v. Flex-N-Gate Corp.*, 740 F.3d 411, 416 (7th Cir. 2014); *In re Equip. Acquisition Res., Inc.*, 742 F.3d 743, 745 (7th Cir. 2014). But I do not read those references as foreclosing the straightforward reading of the statute's text as setting an outer limit based on the debtor's act of transfer—a statute of repose, not limitations. *Cf. In re SGK Ventures, LLC,* 521 B.R. 842, 853–54 (Bankr. N.D. Ill. 2014) (categorizing constructive-fraud claims as subject to a "statute of repose").

it another section of the same statute, the omission is presumed to be intentional. *Kucana v. Holder*, 558 U.S. 233, 249 (2010). Since plaintiff doesn't bring a claim under § 160/5(a)(1), she cannot rely on the discovery rule. *See also Waldock v. M.J. Select Glob., Ltd.*, 2005 WL 2978895, at *17 (N.D. Ill. Nov. 7, 2005) (the statute "does not incorporate the discovery rule" into the time bar that applies to §§ 160/5(a)(2) and 6(a)). The common-law discovery rule would not apply either. That rule does not apply when there is "a contrary indication of legislative intent," such as a statute of repose. *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill.2d 72, 78 (1995).

Fraudulent concealment, however, tolls the running of both statutes of limitations and repose. *Orlak v. Loyola Univ. Health Sys.*, 228 Ill.2d 1, 18 (2007). If a defendant "fraudulently conceals" a cause of action, the plaintiff may bring suit within five years after the plaintiff discovers that she has a cause of action. 735 ILCS § 5/13-215. A plaintiff relying on fraudulent concealment must show that the defendant engaged in "affirmative acts or representations" designed to prevent the plaintiff from discovering the cause of action or induce her into delaying filing her claim. *Rocha v. FedEx Corp.*, 2020 IL App (1st) 190041, ¶ 86 (quoting *J.S. Reimer, Inc. v. Vill. of Orland Hills*, 2013 IL App (1st) 120106, ¶ 51). The plaintiff must have detrimentally relied on those deceptions. *Orlak*, 228 Ill.2d at 18; *Butler v. BRG Sports, LLC*, 2019 IL App (1st) 180362, ¶ 68 (plaintiff must show "affirmative acts" by the defendant that were designed to prevent, "and in fact did prevent," the

discovery of the claim). The defendant's "mere silence" does not establish fraudulent concealment. *Doe v. Boy Scouts of Am.*, 2016 IL App (1st) 152406, ¶ 81.[5]

Since untimeliness is an affirmative defense, and plaintiff does not bring a standalone claim for fraudulent concealment, she does not need to plead fraudulent concealment at this stage of the case. But I disagree with plaintiff that her current complaint adequately pleads the exception. She has not identified an affirmative misrepresentation that defendant made.[6] And even if the promissory note itself could be considered an affirmative misrepresentation, plaintiff doesn't plead that she actually relied on that document, or that her reliance on it caused her to forgo filing a fraudulent-transfer claim. According to the complaint, she learned that her ex-husband had transferred MMSN's ownership interest to the grantor trust, and that the brothers had concocted the alleged scheme, at the same time. *See* [1] ¶ 35 (plaintiff learned about the "above described actions" in December 2015); [23] at 7 (plaintiff did not learn of either the fraudulent conveyances or defendant's involvement until December 2015). So, as alleged, there was no period of time when plaintiff knew that her ex-husband had transferred the ownership interest in MMSN out of the revocable trust, but opted not to challenge that transfer because she relied

---

[5] The heightened pleading standard of Rule 9(b) would apply to a standalone claim of fraudulent concealment. But since untimeliness is an affirmative defense, and plaintiff need not plead it all at this stage of the case, Rule 9(b) does not apply.

[6] Plaintiff's argument that defendant made misrepresentations as the "agent" of her ex-husband is conclusory and underdeveloped. *See Bogenberger v. Pi Kappa Alpha Corp., Inc.*, 2018 IL 120951, ¶ 28 (a "mere allegation of agency" is insufficient to plead an agency relationship); *see also Shipley v. Chi. Bd. of Election Commr's*, 947 F.3d 1056, 1063 (7th Cir. 2020) ("Arguments that are underdeveloped, cursory, and lack supporting authority are waived.").

on the promissory note executed by defendant. Likewise, if she discovered the promissory note existed at the same time that she learned it was backdated—a sham—then she couldn't have relied on it earlier.

The fraudulent-concealment exception appears unavailing for a second reason. Fraudulent concealment does not apply if, when the plaintiff discovers her claim, "a reasonable time remains within the relevant limitations period." *Ennenga v. Starns*, 677 F.3d 766, 775 (7th Cir. 2012) (quoting *Barratt v. Goldberg*, 296 Ill.App.3d 252 (1st Dist. 1998)); *Butler*, 2019 IL App (1st) 180362, ¶ 63. Once a party discovers the fraud, "it is no longer concealed," and if time remains in which to file the action, the limitations period is not tolled. *Butler*, 2019 IL App (1st) 180362, ¶ 63.

Plaintiff says she discovered the allegedly fraudulent transfer in December 2015. At that point, three months remained until the statute of repose ended in February 2016. Whether three months was a reasonable amount of time to file a claim is debatable. *See Ennenga*, 677 F.3d at 775 (almost five months was reasonable, so fraudulent concealment did not apply); *Witt v. Jones & Jones Law Offices, P.C.*, 269 Ill.App.3d 540, 544–45 (4th Dist. 1995) (same, where plaintiffs knew about their cause of action three to five months before limitations period ended); *Smith v. Cook County Hosp.*, 164 Ill.App.3d 857, 863 (1st Dist. 1987) (six months was "ample time"); *Brown v. Mason*, 132 Ill.App.3d 439, 442 (4th Dist. 1985) (five-and-a-half months was reasonable). Reasonableness is "generally a fact question," *Smith*, 164 Ill.App.3d at 862–63, and a more complete factual record is necessary to assess whether it was reasonable for plaintiff to sit on her fraudulent-transfer claim with three months left

12

in the original repose period. By December 2015, plaintiff was well into the divorce proceedings and was presumably represented. *See id.* at 863–64 (six months was reasonable time to file within applicable statute of limitations where plaintiff "immediately" alerted his attorney when he learned of the claim).

Plaintiff's reliance on fraudulent concealment to toll the statue of repose looks to be an uphill battle. But she need not plead around affirmative defenses, and, at this stage of the case, it's not obvious that her claim is time-barred. *See Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015) (if any "conceivable set of facts" would defeat a timeliness defense, the issue is better left for summary judgment or trial). The claim is not dismissed as untimely.

### 2. Failure to State a Claim

Plaintiff's ex-husband was the settlor and trustee of the revocable trust, and plaintiff was a beneficiary of that trust. Her theory is that her ex-husband, the debtor, transferred the revocable trust's ownership interest in MMSN to the grantor trust. Defendant, as a co-trustee of the grantor trust and the first transferee of the property, executed a promissory note to the revocable trust for $12.2 million in exchange, and took title to MMSN. But that note was fake. The grantor trust didn't have that money because plaintiff's ex-husband had already transferred it to his mother in Lebanon. The promissory note was forgiven, and the grantor trust never paid anything to the

revocable trust. The brothers' actions defrauded plaintiff out of her interest in MMSN, so the theory goes.[7]

Since a fraudulent-transfer claim sounds in fraud, Rule 9(b)'s heightened pleading standard applies. *Gen. Elec.*, 128 F.3d at 1078–79. The plaintiff "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This generally includes the who, what, when, where, and how of the alleged fraud. *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019). Fraudulent intent may be alleged generally. Fed. R. Civ. P. 9(b).

### a. Creditor-Debtor Relationship

To state a claim for constructive fraud, plaintiff must plead that a debtor-creditor relationship existed between the former spouses. The parties dispute whether plaintiff has plausibly alleged that she was her ex-husband's "creditor" under the statute, and, if she was, when her claim arose. For purposes of § 6(a), her claim must have arisen before the transfer; under § 5(a)(2), the claim could have arisen before or after the transfer.

A creditor under the Fraudulent Transfer Act is a person with a claim, defined as a "right to payment." The definition of a claim is "expansive" in Illinois. *A.P. Properties*, 186 Ill.2d at 528–29; *Apollo*, 403 Ill.App.3d at 187 ("Illinois courts treat

---

[7] Plaintiff refers to her rights to recover both the ownership interest in MMSN as well as the $13.6 million in cash transferred to her former mother-in-law. *See* [1] ¶ 42. But her former mother-in-law (the transferee of the $13.6 million) is not a defendant in this lawsuit. The only property transferred to defendant, in his capacity as trustee of the grantor trust, was the ownership interest in MMSN. So for purposes of Count I, the fraudulent transfer underlying her claim is solely her ex-husband's transfer of the ownership interest in MMSN from the revocable trust to the grantor trust.

'claims' fairly broadly."). A claim may or may not be reduced to judgment; liquidated or unliquidated; fixed or contingent; matured or unmatured; disputed or undisputed; legal or equitable; or secured or unsecured. *Apollo*, 403 Ill.App.3d at 187 (quoting *Falcon v. Thomas*, 258 Ill.App.3d 900, 909 (4th Dist. 1994)). That is also a definition of claim in § 101(5)(A) of the Bankruptcy Code. *In re LaMont*, 740 F.3d 397, 407 (7th Cir. 2014); *see* 11 U.S.C. § 101(5)(A). Like Illinois courts, the Bankruptcy Code defines claim "very broadly." *McClellan v. Cantrell*, 217 F.3d 890, 895 (7th Cir. 2000). According to the legislative history of the Code, "claim" is to be given the "broadest possible definition," encompassing "all obligations of the debtor, no matter how remote or contingent." S. Rep. No. 95-989, at 22 (1987). Still, the definition of a claim under the Fraudulent Transfer Act is not "all encompassing." *A.P. Properties*, 186 Ill.2d at 528–29. The creditor must show that the debtor "owes or potentially owes a 'payment' to the creditor." *Id.* at 529.

Plaintiff did not have a right to payment—so was not a creditor—based on her status as the beneficiary of the trust. Her ex-husband, the settlor of the revocable trust, had the right to revoke her as a beneficiary and transfer the assets. *See* Restatement (Third) of Trusts § 63 (2003) (the settlor of a living trust may "revoke or modify" it if in accordance with the terms of the trust). Under Illinois law, it's the intent of the settlor that matters when construing a trust. *Peck v. Froehlich*, 367 Ill.App.3d 225, 229 (4th Dist. 2006). Plaintiff does not allege that her ex-husband violated the terms of the trust when he removed her as a beneficiary, and doing so was consistent with his intent as the settlor. So her status as a beneficiary does not

establish that she had a right to payment. *See In re Pritzker*, 2004 WL 414313, at *14 (Ill. Cir. Ct. Mar. 5, 2004) (beneficiary of discretionary trust had no right to payment and was not a creditor under the Fraudulent Transfer Act).

But plaintiff's status as a creditor also rests on her role as a spouse, and she has adequately alleged that she had a right to payment from her ex-husband after the transfer. She filed a petition for divorce in 2014, and in 2016, a Cook County court entered judgment in her favor. That is sufficient to allege that she had a right to payment from her ex-husband that arose after the transfer of MMSN in 2012.

Whether she's adequately alleged that a claim arose before the transfer is a closer call. Plaintiff filed for divorce more than two years after her ex-husband transferred the ownership interest in MMSN to the grantor trust. Under Illinois law, the marital estate is not created until a party files for dissolution. During the marriage, each spouse has a "species of common ownership" in marital property, and either spouse can do what he or she likes with their property. 750 ILCS § 5/503(e); *In re Marriage of LaRocque*, 2018 IL App (2d) 160973, ¶ 45. When a spouse files a petition for dissolution, each spouse's contingent interest in the marital property vests. 750 ILCS § 5/503(e); *see In re Thorpe*, 881 F.3d 536, 539–40 (7th Cir.), *reh'g denied*, (Feb. 21, 2018). When the court divides the property, the contingent interest ripens into a "full ownership interest." *Thorpe*, 881 F.3d at 540. So Illinois is a "middle ground" state—unlike community-property states, a spouse doesn't have an independent ownership over property when it's acquired, but does have an interest before a court issues the final divorce judgment. *Id.*

16

I need not resolve whether plaintiff had a right to payment two years before the marital estate was technically created, because she has failed to plead that transferring MMSN's interest rendered her ex-husband insolvent or unable to pay his debts as discussed in more detail below. The concept of a "claim" sweeps broadly in Illinois, and the right to payment can be contingent or unmatured—the creditor must show only that the debtor "owes or potentially owes" a payment to the creditor. *A.P. Properties,* 186 Ill.2d at 529. Plaintiff alleges that the reason her ex-husband emptied the revocable trust in the first place was to minimize his assets because he knew the marriage was over—in other words, he expected to owe her money in short order. When he amended the revocable trust a few days after the transfer, he stated that the couple was already in the process of dissolving their marriage. Given that divorce proceedings appeared to be imminent even before the transfer, and affording the concept of a "claim" the broadest possible definition, plaintiff may have had a potential right to payment from her ex-husband before he transferred the assets. *See generally GEA Grp. AG v. Flex-N-Gate Corp.*, 740 F.3d 411, 417 (7th Cir. 2014) (the drafters of the Uniform Fraudulent Transfer Act eliminated the requirement that a creditor's claim must be matured "to expand the rights of potential victims of fraudulent transfers"); *see also In re Ruitenberg*, 745 F.3d 647, 653 (3d Cir. 2014) (in bankruptcy context, spouse's "claim" before the divorce judgment was "at the least, unliquidated and contingent on a final decree apportioning marital property, perhaps

unmatured, and likely disputed," but nevertheless was "literally [] a 'claim'").[8] That plaintiff's interest in the property didn't officially vest until she filed the petition for dissolution in 2014 isn't necessarily dispositive; she had a "species" of common ownership over the property before that time, and when the ownership interest technically vested for the purposes of divorce proceedings is a different question than when she plausibly had a potential right to payment from her ex-husband.

The parties spill a lot of ink arguing about whether the transferred property constituted part of the marital estate under Illinois law. Plaintiff argues her "claim" arose before the transfer because her ex-husband transferred the assets fraudulently. In Illinois, a spouse may dispose of property during the marriage, even if the transfer is "for the precise purpose of minimizing or defeating the statutory marital interests of the spouse in the property conveyed." *LaRocque*, 2018 IL App (2d) 160973, ¶ 45 (quoting *Johnson v. La Grange State Bank*, 73 Ill.2d 342, 356–57 (1978)). But he may not do so if the transfer is "tantamount to a fraud," meaning colorable or illusory. *Id.* (citation omitted); *see In re Marriage of Frederick*, 218 Ill.App.3d 533, 535–36 (2d Dist. 1991) (circumstances of transfer showed a sham transaction to defraud spouse's marital rights). Plaintiff also argues that her ex-husband dissipated the property,

---

[8] Other states that have adopted the Uniform Fraudulent Transfer Act have considered the definition of a creditor in similar contexts. For example, in Massachusetts, "marriage alone is not sufficient to make one a creditor of her spouse." *Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 46 (1st Cir. 2020) (citation omitted). But in both Massachusetts and Connecticut, a spouse can be a "creditor" if an allegedly fraudulent transfer occurred "while divorce proceedings were either ongoing or imminent." *Id.* Given that Illinois courts have emphasized the broad nature of a "claim," it's instructive that other states with the same statute have recognized a creditor-debtor relationship between spouses before divorce proceedings officially began, provided that those proceedings were imminent.

meaning that he used it "for the sole benefit of one of the spouses" and "for a purpose unrelated to the marriage" while the marriage was undergoing an "irreconcilable breakdown." *In re Marriage of Holthaus*, 387 Ill.App.3d 367, 374 (2d Dist. 2008) (citation omitted). Dissipation of marital property is one factor the divorce court may consider in dividing marital property. 750 ILCS § 5/503(d)(2).

Both arguments address whether the transferred assets should have been included in the marital estate. But neither argument sheds any light on when plaintiff's claim arose. Even if plaintiff plausibly alleged that the transfers were fraudulent or dissipated for purposes of the divorce proceedings, the result that flows from that allegation is that the county court should have included those assets in the marital estate when dividing it. But it has no bearing on whether plaintiff had a "right to payment" from her ex-husband two years before filing for dissolution.

Plaintiff's assertion of a claim before the transfer is dubious even under an expansive interpretation of the Act, but I decline to decide this issue of state law at this stage of the case because of another readily apparent defect in the claim—the ex-husband's solvency.

## b. Reasonably Equivalent Value

Under either subsection of the statute, plaintiff must plead that the debtor did not receive reasonably equivalent value for the transfer. A transfer lacks reasonably equivalent value if "there is no or inadequate consideration." *Jumer*, 472 F.3d at 947. In evaluating whether the exchange was for reasonably equivalent value, courts consider the fair market value of what was transferred and received, whether the

transaction took place at arm's length, and the good faith of the transferee. *In re Chi. Mgmt. Consulting Grp., Inc.*, 929 F.3d 803, 810 (7th Cir. 2019).

Plaintiff's ex-husband appeared to sell the revocable trust's ownership in MMSN to the grantor trust in exchange for a promissory note for $12.2 million. While $12.2 million could be adequate consideration, plaintiff alleges that the promissory note was fake, *see* [1] ¶ 28, and that, in fact, the revocable trust received nothing in exchange for transferring its interest in MMSN to the grantor trust. She has sufficiently alleged that the transfer lacked adequate consideration.

### c. Insolvency

Plaintiff does not plausibly plead that the fraudulent transfer rendered her ex-husband insolvent; that he engaged in, or was about to engage in, a transaction for which his remaining assets were unreasonably small in relation to the debt owed; or that he believed he was about to incur debts beyond his ability to pay. She thus cannot state a claim under the Fraudulent Transfer Act.

A debtor is insolvent if he has "a balance sheet on which liabilities exceed assets." *Chi. Mgmt. Consulting Grp.*, 929 F.3d at 809 (quoting *Baldi v. Samuel Son & Co., Ltd.*, 548 F.3d 579, 581 (7th Cir. 2008)); *see also* 740 ILCS § 160/3(a) (a debtor is insolvent "if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation").

That plaintiff's ex-husband transferred all of his assets out of the revocable trust is insufficient, without more, to establish that the transfer rendered him insolvent or unable to pay his debts. *See* [28] at 2. Quite the opposite: plaintiff argues

that her ex-husband "enjoys … full use of those assets today." [23] at 4. That plaintiff has been unable to collect on the family court judgment because her ex-husband has left the country does not mean that he is unable to pay that judgment. The only reasonable inference to be drawn on this complaint is that he is able to pay his debts, but is simply choosing not to. To state a claim for a fraudulent transfer, plaintiff must plausibly allege that the transfer at issue rendered the debtor insolvent or unable to pay his debts. Absent such an allegation, she cannot state a claim for constructive fraud. *See, e.g.*, *Zimmerman v. Paulsen*, 524 F.Supp.2d 1077, 1080 (N.D. Ill. 2007) (dismissing claim where plaintiffs "failed to adequately allege" that debtor "retained insufficient assets to pay his debts"); *cf. Apollo*, 403 Ill.App.3d at 195 (plaintiff stated a claim under § 5(a)(2) by alleging that transfer "depleted the assets" of the debtor such that it could not pay its debts).

Because plaintiff has not plausibly alleged that her ex-husband became insolvent or was unable to pay his debts after the transfer, defendant's motion to dismiss Count I is granted.

### B. Tortious Interference with Economic Expectancy

When a third party "intentionally prevents another" from receiving "an inheritance or gift that he otherwise would have received" by way of fraud, duress, or other tortious means, that person is subject to liability. *DeHart v. DeHart*, 2013 IL 114137, ¶ 39. To state a claim for tortious interference with an economic expectancy, a plaintiff must establish: (1) the existence of her expectancy; (2) defendant's intentional interference therewith; (3) tortious conduct such as undue influence,

21

fraud, or duress; (4) a reasonable certainty that the expectancy would have been realized but for the interference; and (5) damages. *Id*. The defendant's tortious conduct must have been "wrongful in some way recognized elsewhere by the law." Restatement (Third) of Torts § 18 Interference with Economic Expectation cmt. b.

Tortious-interference claims are intended to hold a defendant liable when he "commits a wrong that injures the plaintiff," but the plaintiff cannot sue the defendant directly "because the immediate victim of the wrong is someone else." *Id*. cmt. b. So the defendant's tortious conduct generally must be aimed at a third party, not the plaintiff. For example, in the related torts of tortious interference with a prospective business expectancy and tortious interference with a contractual relationship, "it has been long held that the defendant's interference must be directed toward a third party." *Douglas Theater Corp. v. Chi. Title & Tr. Co.*, 266 Ill.App.3d 1037, 1047 (1st Dist. 1994) (interference with prospective economic advantage); *Kraft Chem. Co. v. Ill. Bell Tel. Co.*, 240 Ill.App.3d 192, 198 (1st Dist. 1992) (interference with a contractual relationship); *see also Inteliquent, Inc. v. Free Conferencing Corp.*, 2017 WL 1196957, at *16 (N.D. Ill. Mar. 30, 2017) (collecting a "long line of cases" from state and federal courts holding that the element of interference in those torts requires "more than mere allegations of conduct between the plaintiff and defendant" (citation omitted)). Along those lines, for the specific tort of tortious interference with economic expectancy in Illinois, the typical fact pattern involves a defendant exercising undue influence or fraud over a third party (usually the testator) to convince him to disinherit or modify the plaintiff's inheritance. *See, e.g., DeHart*, 2013

IL 114137, ¶ 39; *In re Estate of Ellis*, 236 Ill.2d 45, 52 (2009); *In re Estate of Roeseler*, 287 Ill.App.3d 1003, 1021, (1st Dist. 1997).

Here, plaintiff's claim fails because she does not identify a tort that defendant committed against the ex-husband (or another third party) sounding in fraud, undue influence, or duress. She alleges the opposite—her ex-husband was the ringleader and orchestrator of the scheme, and defendant assisted him. There is no allegation that defendant exerted undue influence over the ex-husband, defrauded him in some way, or otherwise convinced him to rearrange his assets to shortchange plaintiff. On this complaint, the ex-husband acted intentionally and independently, and defendant merely provided help with appearances on the back end.

Moreover, plaintiff's complaint does not establish a reasonable certainty that, but for defendant's interference, she would have realized her economic expectancy. Without knowing what the interfering tortious act is alleged to be, it's difficult to assess causation. But in any event, defendant's involvement in the scheme as alleged was minimal. He participated in the cover-up, not the transfer itself. He was not the one who transferred the assets, and the facts do not support the inference that, but for the fake promissory note, plaintiff would have collected on the judgment entered against her ex-husband. The barrier to plaintiff's realizing her economic expectancy is that her ex-husband transferred his assets abroad and then fled the country, not anything that defendant did or didn't do.

Count II is dismissed for failure to state a claim.

### C. Civil Conspiracy

To state a claim for civil conspiracy, a plaintiff must allege the existence of an agreement between two or more people to participate in an unlawful act or a lawful act in an unlawful manner, and that one of the parties performed a tortious act in furtherance of the agreement that caused an injury. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 509 (7th Cir. 2007); *Lewis v. Lead Indus. Ass'n*, 2020 IL 124107, ¶¶ 18–21. Conspiracy is not a separate tort in Illinois; it is a means of establishing vicarious liability among coconspirators for an underlying tort. *Merrilees v. Merrilees,* 2013 IL App (1st) 121897, ¶ 49. The "gist of a conspiracy claim" is not the agreement itself, "but the tortious acts performed in furtherance of the agreement." *Lewis*, 2020 IL 124107, ¶ 19 (quoting *Adcock v. Brakegate, Ltd.*, 164 Ill.2d 54, 63 (1994)). So to state a claim, the plaintiff must state an independent cause of action underlying the conspiracy. *Merrilees*, 2013 Ill App (1st) 121897, ¶ 45.

The defendant himself need not have performed the unlawful or tortious act. *See Adcock v. Brakegate, Ltd.*, 164 Ill.2d 54, 64 (1994). The point of a civil-conspiracy claim is to extend liability "beyond the active wrongdoer" to those who have "planned, assisted or encouraged the wrongdoer's acts." *Lewis*, 2020 IL 124107, ¶ 19 (quoting *Adcock*, 164 Ill.2d at 62). Once the conspiracy is formed, "all of its members are liable for injuries" caused by unlawful acts performed to further the conspiracy. *Id.* ¶ 20 (quoting *Adcock,* 164 Ill.2d at 65). If the underlying tort sounds in fraud, Rule 9(b) applies. *Borsellino*, 477 F.3d at 509.

24

It's unclear whether plaintiff is alleging that the tortious conduct underlying her civil-conspiracy claim sounds in fraud. She identifies breach of fiduciary duty and conspiracy to interfere in her rights to the marital estate as the torts underlying her claim, but also refers to defendant "participating in a fraud." [23] at 14. In any event, plaintiff has pleaded with sufficient particularity under both Rule 8 and Rule 9(b) that, in March 2012, her ex-husband, his attorneys, and defendant agreed to backdate a series of transactions to create a fake paper trail. Plaintiff identifies the parties to the agreement, when it was formed, and what its object was; those allegations satisfy both Rule 8 and Rule 9(b). *Cf. Borsellino*, 477 F.3d at 509 (dismissing conspiracy claim where the complaint "tells us nothing about the nature of the purported agreement to defraud the plaintiffs, such as when it was made or which individuals … arranged the conspiracy").

But plaintiff's civil-conspiracy claim fails because she has not sufficiently pleaded an independent tortious act underlying the civil conspiracy. Violating rights to a marital estate is not an independent tort. Breach of fiduciary duty is a tort; to state a claim, she must allege that a fiduciary duty exists, the fiduciary duty was breached, and the breach proximately caused her injury. *Lawlor v. N. Am. Corp. of Ill.*, 2012 IL 112530, ¶ 69. As the trustee of the revocable trust, plaintiff's ex-husband had a fiduciary duty to her while she was a beneficiary of the trust. *Janowiak v. Tiesi*, 402 Ill.App.3d 997, 1006 (1st Dist. 2010). She alleges that he breached that duty by transferring all of the assets out of the trust without consideration. [1] ¶ 53. But breach of fiduciary duty cannot sustain plaintiff's civil-conspiracy claim, because that

breach predated the alleged agreement. According to the complaint, plaintiff's ex-husband breached his fiduciary duty to her on February 27, when he transferred the assets out of the trust. A few days later, on March 3, he removed her as a beneficiary of the trust, ending their fiduciary relationship. [1] ¶¶ 21–23, 52. On March 7, defendant, the ex-husband, and the ex-husband's attorneys executed a series of documents to make it look like defendant's brother had transferred $13.6 million to the grantor trust before transferring the money to Lebanon. In other words, there is no allegation in the complaint that defendant and his brother made an agreement to breach a fiduciary duty to plaintiff before or on February 27, then one of them took a step in furtherance of that agreement. Defendant's involvement came later, as plaintiff acknowledges in her brief. *See* [23] at 2 ("*After* amending the Rev Trust, Michel enlisted his brother, Marc, in a series of sham transactions." (emphasis added)). Moreover, the alleged coconspirators did not agree to the transfer itself, but to the creation of a fake paper trail covering up that transfer. Absent any independent tort committed in furtherance of the conspiracy—in this case, a tort committed by one of the coconspirators to further the cover-up—plaintiff's claim for civil conspiracy fails. *See Pluciennik v. Vandenberg*, 2018 IL App (3d) 160726, ¶ 22 (dismissing civil conspiracy claim because plaintiff "failed to allege a separate cause of action" underlying the conspiracy).

## IV. Conclusion

Defendant's motion to dismiss, [21], is granted. When an original complaint is dismissed under Rule 12(b)(6), a court should allow at least one opportunity to amend

the complaint before dismissal with prejudice. *O'Brien v. Vill. of Lincolnshire*, 955 F.3d 616, 628 (7th Cir. 2020). All counts are therefore dismissed without prejudice. If an amended complaint is not filed by November 5, 2020, the dismissal will convert to one with prejudice and the clerk will enter final judgment.

ENTER:

Manish S. Shah
United States District Judge

Date:  October 15, 2020